# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 39045**

_____

**UNITED STATES**
*Appellee*

**v.**

**Nicholas B. STATHATOS**
Airman Basic (E-1), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 22 June 2017

_____

*Military Judge:* Lyndell M. Powell.

*Approved sentence:* Dishonorable discharge, confinement for 8 years, and for-feiture of all pay and allowances. Sentence adjudged 9 December 2015 by GCM convened at Kirtland Air Force Base, New Mexico.

*For Appellant:* Major Jarett Merk, USAF.

*For Appellee:* Major Matthew J. Neil, USAF; Major Mary Ellen Payne, USAF; Major Meredith L. Steer, USAF; Captain Matthew L. Tusing, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, JOHNSON, and SPERANZA, *Appellate Military Judges.*

Senior Judge JOHNSON delivered the opinion of the court, in which Senior Judge MAYBERRY and Judge SPERANZA joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4**

_____

JOHNSON, Senior Judge:

A military judge sitting as a general court-martial convicted Appellant, con-trary to his pleas, of one specification of rape, five specifications of assault, and one specification of communicating a threat, in violation of Articles 120, 128,

and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 928, 934. The military judge sentenced Appellant to a dishonorable discharge, confinement for eight years, and forfeiture of all pay and allowances. The convening authority approved the sentence as adjudged.

On appeal, Appellant asserts the evidence is factually and legally insufficient to sustain his convictions. We disagree and affirm.

## I. BACKGROUND

Appellant was stationed at Kirtland Air Force Base (AFB), New Mexico, when he met the victim, ADS, in April of 2010. ADS was 17 years old at the time. They married in March 2011. In June 2011, ADS became pregnant, and in December she gave premature birth to a daughter by caesarian section.

In February 2012, Appellant and ADS got into an argument because Appellant wanted to have sexual intercourse but ADS did not because it was still painful for her. After ADS had gone to sleep, Appellant woke her up by grabbing her arm, pinning it to the bed, and running his other hand along her body. ADS moved away from him, sat up, and slapped him. Appellant then slapped ADS, causing her nose to bleed. ADS responded by picking up her cell phone and attempting to leave the room, telling Appellant she was going to call the police. Appellant then grabbed the phone away from her, seized her by the throat, and pushed her down on the bed. As Appellant immobilized her, he told ADS if she "told anybody" what had happened he would kill her, their daughter, and then himself. Appellant then pulled down ADS's clothing and raped her.

In early May of 2012, Appellant and ADS hosted another couple, Senior Airman (SrA) DR and his wife JR, at their off-base apartment. ADS did not drink alcohol that night because she was nursing their daughter; the other adults were drinking. Appellant and ADS got into an argument over Appellant's desire to smoke his hookah in the living room. At one point, Appellant followed ADS into the bedroom, away from the guests, and struck her in the chest, knocking her down into a pile of clothes in the closet. Appellant followed ADS back into the living room where JR was drawn into the confrontation. Soon thereafter Appellant ordered the guests to leave.

After they left, SrA DR and JR called the Albuquerque police and requested they respond because Appellant was "really drunk" and ADS needed assistance. In the meantime, as ADS was walking between the bathroom and bedroom, Appellant seized her from behind and locked his arm around her neck. Appellant slowly tightened his hold, causing ADS's ears to ring and her vision to get dark. At that moment they heard a knock at the door. Appellant told

ADS, "If that's the cops you're going to die." Appellant then released her, retreated to the bedroom, and closed the door. ADS answered the door and spoke with two police officers. She acknowledged there had been an argument earlier, but told them everything was currently "fine," and that Appellant and the baby were sleeping. The police departed. She later testified she did not report being assaulted or threatened because she thought Appellant might spare her if she kept him out of trouble, and because she did not think the police could help her.

Appellant and ADS moved into housing on Kirtland AFB in May 2012. One evening in July 2012, ADS was in the bathroom brushing her teeth. Appellant, who had been drinking, entered and asked her if she wanted to have sex. ADS told him she did not, because they had been arguing earlier. Appellant became angry. He left but soon returned with a pistol. He placed the tip of the barrel against the side of ADS's head. ADS testified that as he held it there, Appellant made a "creepy . . . serial killer grin kind of look" into the bathroom mirror. ADS was too frightened to move, and she urinated on herself. Appellant then held the pistol to his own head and continued to grin into the mirror. He then set the pistol down on the bathroom counter and walked out. ADS hid the pistol in a closet.

ADS testified that for the next year, every time Appellant "got drunk I kind of tried to slip into the woodwork and just do everything that he asked whether it be sex when I didn't want to, I agreed to everything because I was afraid that he would do something violent." She further testified she thought her daughter "deserved to have a dad and I felt that I could maybe try to get a little bit of normalcy for her . . . if I gave a good front and if I did everything that I was asked maybe everything would be okay."

However, in August or September of 2013 Appellant and ADS had another argument that culminated in Appellant grabbing, twisting, and threatening to break ADS's ankle. In December of 2013, during another argument, Appellant grabbed ADS's wrist and twisted it painfully behind her back. Later that month ADS noticed severe pains in her wrist when she tried to pick up the family's dog. Soon thereafter, ADS tripped on the stairs and broke her fall with her wrist. The injury to her wrist eventually required surgery. Again, ADS did not report the assault; to her doctors, she attributed the injury to picking up her dog or to falling on the stairs.

Finally, one night in June 2014 Appellant returned to the house drunk in the early hours of the morning. Appellant woke ADS and asked her about having sex. ADS said she did not want to have sex. Appellant became angry and noisy, shouting profanities as he went upstairs. This awoke the couple's daughter, who had been downstairs sleeping with ADS. The daughter crawled up the stairs to see Appellant, and ADS followed. Appellant and ADS argued some

more, and Appellant told ADS to leave the room. When ADS bent down to pick up the daughter, Appellant seized ADS by the throat and pushed her into the closet, causing her head to hit the closet door before she fell to the floor. Appellant choked ADS and yelled at her in front of their screaming daughter before he eventually let her go.

The following month, Appellant attempted suicide. As a result, ADS met with Master Sergeant (MSgt) M, Appellant's acting first sergeant. Although ADS had never reported the abuse she suffered from Appellant, and did not intend to do so when she entered the meeting, MSgt M noticed a bruise on ADS's leg. When he inquired about it, ADS told him she received it while hiking. Suspicious, MSgt M asked ADS whether she was in an abusive household. ADS reluctantly admitted that she was. Two weeks later, MSgt M referred her to the base Family Advocacy office, which referred her to the Air Force Office of Special Investigations (AFOSI) when she told them about the rape.

## II. DISCUSSION

### A. Standard of Review

We review issues of factual and legal sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The "reasonable doubt" standard does not require that the evidence be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325; *see also United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to

whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

**B. Analysis**

The military judge convicted Appellant of the following specification of rape in violation of Article 120, UCMJ:

> [Appellant] did, at or near Albuquerque, New Mexico, between on or about 1 February 2012 and on or about 31 March 2012, cause [ADS] to engage in a sexual act, to wit: penetrating her vulva with his penis, by placing her in fear that she would be subjected to death or grievous bodily harm.

Appellant was also convicted of the following specifications of assault in violation of Article 128, UCMJ:

> [Appellant] did, at or near Albuquerque, New Mexico, between on or about 1 April 2012 and on or about 31 May 2012, unlawfully strike [ADS] on the chest with his hands.

> [Appellant] did, at or near Albuquerque, New Mexico, between on or about 1 July 2012 and on or about 31 August 2012, assault [ADS] by pointing a firearm at her head.

> [Appellant] did, at or near Albuquerque, New Mexico, between on or about 1 August 2013 and on or about 30 September 2013, unlawfully twist the foot of [ADS] with his hands.

> [Appellant] did, at or near Albuquerque, New Mexico, between on or about 1 December 2013 and on or about 31 January 2014, unlawfully twist the wrist of [ADS] with his hands.

> [Appellant] did, at or near Albuquerque, New Mexico, between on or about 1 June 2014 and on or about 31 July 2014, unlawfully grab [ADS] by the throat with his hands.

Finally, the military judge also found Appellant guilty of the following specification of communicating a threat in violation of Article 134, UCMJ:

> [Appellant] did, at or near Albuquerque, New Mexico, between on or about 1 April 2012 and on or about 31 May 2012, wrongfully communicate to [ADS] a threat to kill her if the cops were

5

> at the door, such conduct being of a nature to bring discredit upon the armed forces.[1]

Essentially, Appellant argues ADS's testimony is unsupported and insufficiently credible to sustain his convictions. Certainly, the essential evidence of Appellant's guilt was the testimony of ADS, who testified to the events described above. However, the Government introduced other evidence as well.

The Government offered the expert medical testimony of Major (Dr.) WC, an orthopedic surgeon who explained the injury to ADS's wrist that required surgery could have been caused by having it twisted as ADS described. However, he agreed the injury could also have been caused by a fall. The Government also called Dr. HR, a forensic psychologist who testified regarding counterintuitive behavior by victims of domestic violence, including reasons why a victim may not report the abuse.

In addition, the Government called SrA DR to testify. Although he did not witness any physical violence during the May 2012 incident, his testimony supported ADS's account in several respects. He confirmed Appellant and ADS did go into the bedroom at one point. He confirmed they were arguing that night, and that Appellant was "aggravated, condescending," and "pissed off" towards ADS. He further testified that when his wife JR tried to intervene, Appellant "got in her face" and became "threatening" toward her. Finally, he testified that Appellant did ask him and JR to leave, and that he then called the police because he thought ADS "needed help."

The Government introduced several other items of evidence, including a recording of SrA DR's call to the Albuquerque police; a civilian police report describing the call and the officers' visit to Appellant's residence; Appellant's base firearms registration form, indicating Appellant did keep a pistol in his on-base residence; and a text message exchange between Appellant and ADS on 23 July 2014—after his suicide attempt—wherein he wrote:

> [I] know you hate me. [I] don't blame you either. I guess [I] usually ask to [sic] much. . . . I know leaving wasnt [sic] easy but thats [sic] the wall we hit. Things happened that were out of control. Im [sic] so sorry about everything. I wont [sic] stop saying that.

Appellant contends that by the time ADS reported the crimes, she had initiated divorce and child custody proceedings against Appellant, and therefore had a strong motive to fabricate allegations. However, several factors undercut

---

[1] The military judge made this finding by exception and substitution, excepting the words "injure her if she reported him to law enforcement" from the original specification and substituting in their place the words "kill her if the cops were at the door."

the force of this argument. The evidence indicates ADS never planned to accuse Appellant of abuse. His crimes came to light only because MSgt M, with whom she was meeting in the aftermath of Appellant's suicide attempt, noticed the bruise on her leg and challenged her initial innocent explanation. Even then, ADS did not make a report to law enforcement but merely accepted MSgt M's referral to Family Advocacy counseling. It was only when the counselor there recognized that what ADS was describing was a sexual assault that ADS was referred to AFOSI. In addition, the pattern of threats and physical abuse ADS described, coupled with the reasons she related for not reporting, and illuminated by Dr. HR's testimony regarding behavior of victims of domestic violence, provide a very credible explanation as to why she did not report the abuse earlier. Moreover, it is unlikely ADS felt she required rape or assault allegations to gain the upper hand in child custody proceedings in the wake of Appellant's suicide attempt.

Appellant also emphasizes, *inter alia*, the absence of eyewitnesses other than ADS to the offenses; the absence of contemporaneous evidence of injuries ADS suffered in the assaults, other than the wrist surgery; Dr. WC's acknowledgment that ADS's wrist could have been injured in a fall; postings ADS made on social media websites depicting a happy domestic life; and testimony from another noncommissioned officer that in the summer of 2014 ADS told him that, although she felt unsafe around Appellant, he had never hurt her. In our view, none of these arguments significantly undermine the evidence supporting Appellant's convictions. Drawing "every reasonable inference from the evidence of record in favor of the prosecution," *Barner*, 56 M.J. at 134, the evidence was legally sufficient to support Appellant's convictions beyond a reasonable doubt. Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction is therefore both legally and factually sufficient.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred.[2] Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court

---

[2] We note an error in the promulgating order with respect to the language of the Specification of Charge III, where it incorrectly reports the words substituted by the military judge. Specifically, the order reports the military judge substituted "kill her if she reported him to law enforcement," when in fact he found Appellant guilty of the substituted words "kill her if the cops were at the door." We direct the publication of a corrected court-martial order to remedy this error.